# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **MARK MAZZUCA** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 2907 |
| | ) | |
| v. | ) | Magistrate Judge Daniel G. Martin |
| | ) | |
| **CAROLYN COLVIN,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark Mazzuca ("Plaintiff" or "Mazzuca") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability benefits and Supplemental Security Income benefits ("SSI") under Title II of the Social Security Act, and Mazzuca filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross-motion. The parties have consented to have this Court conduct all proceedings in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons stated below, both Plaintiff's and the Commissioner's motions are granted in part and denied in part.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(I). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional ability to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform

2

in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. <u>Background Facts</u>

### A. Medical History

Plaintiff began treatment with psychiatrist Dr. Melissa Chappell in October, 2005.

Dr. Chappell noted that he showed a chronic "down mood" and diagnosed him with dysthymia and depression. (R. 335, 337). She prescribed Effexor to treat Mazzuca's mood disorder, though her notes suggest that he had already taken Wellbutrin, Serzone, and Adderall. (*Id*.). Dr. Chappell's treatment notes imply that Mazzuca's moods altered significantly from one session to another. In late 2005, he reported feeling "aimless" both at work and in his marriage. (R. 332-33). By January 2006, however, Plaintiff reported feeling better and more motivated. (R. 329). Dr. Chappell doubled the dose of Effexor and, in October 2006, increased it once again. (R. 315, 321).

Dr. Chappell noted throughout 2007 that Mazzuca tolerated his medication well and that his sleep patterns were stable. (R. 298, 300, 304, 307). By November 2007, his insight had "greatly improved." (R. 298). Plaintiff expressed growing anxiety by the summer of 2008, when Dr. Chappell observed that he was too anxious to go to work and had suddenly quit his job. (R. 292, 294). Her notes indicate a flat affect, obsession, and some anhedonia that led her to increase his Effexor levels once again in late 2008. (R. 289, 290). By September 2009, Dr. Chappell stated that Mazzuca was having difficulty getting out of bed at least twice a week and was ruminating "about capitalism and socialism." She responded by once more increasing his Effexor prescription. (R. 277).

Within a few weeks, however, Plaintiff stopped taking his medication altogether. (R. 273). He claimed that he felt better without them, but by October 21, 2009, he began taking Prozac instead of Effexor. Dr. Chappell noted that Mazzuca had gambled away $10,000 in 2009. (R. 270). The dosage levels of Prozac rose throughout 2010, as Dr. Chappell noted good and bad days for Plaintiff. He reported feeling "exuberant" one day, but feeling miserable the following week. (R. 262). Dr. Chappell changed Plaintiff's

medication to Pristiq.  Throughout his treatment with Dr. Chappell, Mazzuca also met with counselor Kristin Mikolite on a more frequent basis.

Mazzuca began expressing increased doubts about the effectiveness of his medication in late 2010.  (R. 417- 20).  By August and September of that year, he wrote a series of letters to Dr. Chappell outlining his complaints about treatment.  Mazzuca stated that his medication merely "masks" things and that he planned to commit suicide once his parents died.  (R. 243).  Plaintiff accused Dr. Chappell of having "the blood of Americans on [her] hands" and encouraged her to "get out [of] the exploitation of people business." (R. 245).  An August 30, 2010 letter describes Mazzuca's gambling, hoarding, spending, and drinking sprees.  He asked Dr. Chappell to treat him for bipolar disorder, which he claimed afflicted other members of his family.  (R. 238-41).  Two September letters described Mazzuca's sleep problems in detail, as well as complaints of "[t]he tyranny of the Capitalistic System to control, devalue, and exploit the individual through technology."  (R. 235).

Mazzuca's growing depression resulted in psychiatric hospitalization at the Linden Oaks Hospital in November 2010.  Dr. Martins Adeoye noted on November 5 that Mazzuca was suffering from severe depression and a generalized anxiety disorder. He expressed suicidal thoughts, with poor insight and a Global Assessment of Functioning ("GAF") of 25.[1]

---

[1]  GAF scores reflect a clinician's assessment of a patient's overall level of functioning.  *See* Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  GAF scores between 21 and 30 suggest behavior "influenced by delusions or hallucinations OR serious impairment in communications or judgment OR inability to function in all areas."  *Packard v. Astrue*, No. 11-7323, 2012 WL 4717890, at *3 (E.D. Pa. Oct. 4, 2012) (internal quote and citation omitted).  "GAF scores are intended to be used to make treatment decisions . . . not as a measure of the extent of an individual's disability."  *Martinez v. Astrue*, No. 9 C 3051, 2010 WL 1292491, at *9 (N.D.

Plaintiff was considering buying a gun and had been unsuccessful in searching the internet for the best way to kill himself. Dr. Adeoye stated that Mazzuca had serious problems with his sleep patterns and was experiencing "significant mental health problems." (R. 539-40). Plaintiff was released on November 10 with a "guarded" prognosis. Dr. Adeoye noted that he had shown significant improvement when Seroquel was added to the Pristiq that Mazzuca was already taking on admission. (R. 542).

Plaintiff continued to see Dr. Chappell for a few treatment sessions after being released from the hospital. However, the psychiatrist noted on November 11, 2010 that Mazzuca had stopped taking Seroquel because of nausea and that he was not taking any other antidepressant. One week later, Plaintiff met with Dr. Evaldas Radzevicius at Advocate Christ Medical Center for a psychiatric evaluation. Dr. Radzevicius noted that Mazzuca's depression had become worse through the years and that he was having difficulty with his sleep. The psychiatrist diagnosed Plaintiff with a major depressive disorder. Mazzuca was reluctant to take any medication, stating that they were "a big scam" perpetrated by pharmaceutical companies "who are drug dealers." (R. 697). However, he agreed to try Lexapro at Dr. Radzevicius' suggestion. (R. 698). Mazzuca's condition had improved by December 1, when he reported that he felt better and was sleeping more normally. (R. 793).

By March 23, 2011, the psychiatrist noted that Mazzuca was "feeling much better" and showed logical thinking. Dr. Radzevicius also changed his diagnosis to include bipolar disorder NOS and dysthymic disorder. (R. 830). Plaintiff continued to see Dr. Radzevicius

---

Ill. Mar. 29, 2010) (internal quote and citation omitted).

at least through July 22, 2011.  The psychiatrist had changed his medication during this treatment period from Lexapro to Remeron, and finally to Zoloft.  Dr. Radzevicius' last treatment note in the record states that Mazzuca was "sad" and "glum," though he believed that his medication was working.  He recommended that Mazzuca continue with the psychotherapy sessions that he had been pursuing with social worker Elizabeth Bulmer. (R. 811).

### B.    Consulting and State Agency Physicians

### 1.    Dr. Melissa Chappell

Psychiatrist Dr. Melissa Chappell issued a Mental Impairment Questionnaire on May 13, 2010.  Dr. Chappell assigned Mazzuca a GAF score of 60.  She noted that Plaintiff had responded to Prozac and weekly therapy.  He showed improved mood, energy, and motivation.  Dr. Chappell determined that Mazzuca had a mild limitation in his activities of daily living and a moderate restriction in social functioning.  She failed to note what limitation applied to his concentration, persistence, and pace.  In addition, Mazzuca's psychiatrist believed that he had experienced three episodes of decompensation within a twelve-month period, with each episode lasting at least two weeks.  Plaintiff's prognosis was assessed as "fair - good."  (R. 383-86).  The ALJ gave no weight to Dr. Chappell's opinion.  (R. 27-28).

### 2.    Dr. Tyrone Hollerauer

State agency psychologist Dr. Tyrone Hollerauer issued a Psychiatric Review Technique ("PRT") assessment of Plaintiff on April 14, 2010.  Dr. Hollerauer found that Mazzuca suffered from an affective disorder, an anxiety disorder, and a substance

addiction disorder, none of which were severe. Plaintiff was not found to be bipolar. Contrary to Dr. Chappell's view, Dr. Hollerauer concluded that Mazzuca had not experienced any episodes of decompensation. He also determined that Plaintiff had only a mild limitation in all three of his functional categories of daily living, social functioning, and concentration. (R. 359-71).

### 3. Dr. Larry Kravitz

After the hearing, the ALJ requested an evaluation from non-examining psychologist Dr. Larry Kravitz. Dr. Kravitz diagnosed Mazzuca with bipolar and dysthymic disorder. These impairments did not meet or medically equal a Listing. Dr. Kravitz agreed with Dr. Chappell that Mazzuca suffered from a mild limitation in activities of daily living and a moderate limitation of social functioning. He also determined that Plaintiff had a moderate restriction in his concentration, persistence, and pace. However, the form given to Dr. Kravitz did not ask for the number of decompensation episodes. It only allowed the psychologist to assess the severity of any episodes of extended duration that may have existed. Dr. Kravitz found that Mazzuca had a moderate limitation under this functional category. (R. 833-43).

### C. Hearing Testimony

Mazzuca appeared at the hearing before ALJ Supergan on July 11, 2011. He testified to a series of personal and professional difficulties that he claimed stemmed from his mental impairments. Mazzuca formerly worked as a financial planner until he was terminated in January 2007. He stated that his production had gone from the highest in his office to zero within the last year of his job. Mazzuca did not give reasons for the

decline in his productivity. However, he stated that he had serious hesitations about encouraging clients to invest in oil companies that "started wars" and worked to "overthrow a democracy." (R. 56). Mazzuca further linked his work to national politics by claiming that his participation in financial planning had caused the election of President George W. Bush. (R. 56). Plaintiff expressed additional fears that the government might be targeting him in some way. (R. 55).

Mazzuca stated that he found it difficult to find work because he becomes frustrated easily and has difficulty maintaining his concentration. Plaintiff applied for a job at Menard's in 2008, but left because people there looked at him "funny." (R. 48). He also interviewed for a position with another company, but felt the need to leave within a few minutes because the employees were not wearing gloves. (R. 52). Plaintiff expressed significant concerns about being contaminated by germs. (R. 52). Mazzuca did obtain a position in 2008 as a sleep apnea technician after he received a training certificate. However, he felt the need to walk out of that job because he felt overwhelmed. (R. 46-47).

When he was fired in January 2007, Mazzuca also stopped drinking after years of excessive alcohol use. He regularly attends meetings of Alcoholics Anonymous ("AA") and has maintained sobriety. (R. 50). Plaintiff testified that he has also struggled with compulsive gambling and spending. Mazzuca stated that his level of functioning had diminished during the years that preceded the hearing. He stopped taking trips with his wife and was no longer able to eat out except on rare occasions at places where he felt safe. (R. 51-52, 580). Mazzuca stated that once a month he is completely unable to get out of bed or to leave his house. These periods of decompensation last for several days at a stretch. (R. 54-55). Plaintiff's social activities are limited to attending AA and therapy

meetings several times a week. (R. 58). Otherwise, his daily activities are limited to helping his wife care for their two dogs and listening to the radio over the internet. (R. 48-49). Mazzuca also stated that he has ongoing problems with sleep. At times he wakes up often and sleeps during the day; at other times he sleeps for long periods of time at a stretch. (R. 60).

Plaintiff's wife also testified at the hearing. Mrs. Mazzuca stated that her husband's ability to help with chores had diminished dramatically over the past few years. He no longer cooks dinner, goes out, or rides bicycles. (R. 64). Mazzuca does help his wife with laundry and prepares light meals, but he can only do so about three times a week. (R. 64-65). Mrs. Mazzuca confirmed her husband's statement that he often finds it difficult to get out of bed or to leave their home. (R. 65). His relations with other people are often contentious. (R. 65-66). She also stated that he was "very paranoid over the government" and had "extreme" political views. (R. 67).

### D. The ALJ's Decision

On October 7, 2011, ALJ Supergan issued a written decision finding that Plaintiff was not disabled. The ALJ determined at Step 1 that Mazzuca had not engaged in substantial gainful activity since his alleged onset date of July 1, 2008. Plaintiff's severe impairments at Step 2 included bipolar disorder, dysthymic disorder, and a history of substance abuse. At Step 3, the ALJ applied the "special technique" required under 20 C.F.R. § 1520(a) for assessing the severity of mental disorders. She concluded that Mazzuca had a mild restriction in his activities of daily living, and moderate restrictions in social functioning and concentration. One to two episodes of decompensation were also found. None of Plaintiff's severe impairments met or medically equaled a Listing.

10

Before moving to Step 4, the ALJ assessed Mazzuca's credibility. The ALJ gave Plaintiff's testimony "some weight," she concluded that it was not credible "to the extreme limitations" that Mazzuca claimed. The ALJ also assessed Plaintiff's RFC, finding that Mazzuca could perform a full range of work at all exertional levels. The ALJ accounted for Plaintiff's mental impairments by limiting him to unskilled work involving tasks that can be learned by demonstration or within a limited time period. Plaintiff was also limited to only occasional decision making, work changes, and restricted contact with supervisors or the public. Based on this RFC, the ALJ found at Step 4 that Mazzuca could not perform his past relevant work. The ALJ heard testimony from the VE at Step 5 and concluded that Plaintiff was not disabled because a significant number of jobs existed that he could perform.

### III. Discussion

Mazzuca challenges the ALJ's decision on three grounds. He claims first that the ALJ did not correctly weigh the medical opinion of Dr. Chappell. Mazzuca also argues that the ALJ erred in her Step 3 discussion of Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders). Third, Plaintiff contends that the ALJ improperly assessed the credibility of the testimony he and his wife gave at the hearing. The Court addresses each of these arguments in turn.

### A. The ALJ Improperly Weighed Opinion Evidence

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do.").

The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008). "A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

Mazzuca argues that the ALJ violated this standard when she gave no weight to Dr. Chappell's Mental Impairment Questionnaire. The ALJ cited two reasons for her decision concerning Plaintiff's treating psychiatrist. She concluded first that the doctor's opinion "would be work preclusive due to the number of anticipated absences from work among other things even though she described the claimant's prognosis as 'fair to good.'" (R. 27). Second, the ALJ noted that Dr. Chappell assigned Mazzuca a GAF of 60, which suggests a "moderate" limitation in social and occupational functioning. The ALJ believed that this finding was "contrary to other treatment notes in the record." (R. 27-28).

Neither of these explanations satisfies the requirements for evaluating a treating physician's opinion. The Commissioner claims that the ALJ's first reason is justified because Dr. Chappell's prognosis for Mazzuca cannot reasonably be applied to a disabled claimant. Although not entirely clear, both the Commissioner and the ALJ appear to assume that Dr. Chappell's report rests on a contradiction between her prognosis and a finding that Mazzuca was disabled.

12

The Court respectfully disagrees with this claim. An internal inconsistency can be a ground for not giving controlling weight to the opinion of a treating physician. 20 C.F.R. § 404.1527(c)(2); *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). In this case, however, it is not clear what inconsistency exists. Dr. Chappell never gave an opinion that Mazzuca was disabled or could not work.[2] She only stated that Plaintiff would miss two days of work each month and had a prognosis of "fair – good." (R. 384, 386). A "prognosis" is not an assessment of a person's overall functional capacity; it is the "probable outcome of a present medical condition (such as a disease)." Black's Law Dictionary 1330 (9th ed. 2009).

The common-sense meaning of Dr. Chappell's statement is that, although Mazzuca's *current* mental status would require a work absence of two days a week, there was a reasonable probability that he would improve over time with continued treatment. The ALJ provided no explanation of why this finding gives rise to a contradiction that would justify rejecting Dr. Chappell's report in its totality. Thus, the ALJ failed to build a logical bridge between the record and her conclusion on this issue. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005) (stating that an ALJ is always required to explain the basis for her reasoning and to draw a logical bridge between the evidence and her findings).

The ALJ's second reason for rejecting Dr. Chappell's report was that "other treatment notes" contradicted the psychiatrist's GAF score of 60. Contradictions between

---

[2] The ALJ would have been justified in rejecting any statement by Dr. Chappell that Mazzuca was disabled. Such conclusions are reserved exclusively to the Commissioner. 20 C.F.R. § 404.1527(e)(2). The ALJ's comment seems to refer to the VE's testimony that if Mazzuca could not work for two days a week, as Dr. Chappell claimed, he would not be able to perform full-time work.

an expert's report and other substantial evidence can be a basis for giving less than controlling weight to a treating physician. 20 C.F.R. § 404.1527(c)(2). The ALJ cited many GAF scores in the record that were inconsistent with Dr. Chappell's. For example, Dr. Adeoye assessed Plaintiff's score as a 25 six months after Dr. Chappell issued her May 2010 opinion; Dr. Radzevicius assigned a score of 45 twelve days after Dr. Adeoye's report; and Dr. Kravitz gave Plaintiff a GAF of 50. (R. 540, 698, 830).

The Court disagrees that these contradictions were sufficient to reject Dr. Chappell's report without further discussion. The ALJ assumed that scores assigned to Plaintiff at other times provided a standard against which Dr. Chappell's assessment of 60 could be judged as deficient. To do so, however, the ALJ was required to account for two factors that cast doubt on her current finding. First, the record strongly suggests that Plaintiff's GAF levels fluctuated over time. That is not surprising in light of Mazzuca's bipolar disorder. In addition, many courts have noted that "GAF scores often vacillate." *Hunt v. Astrue*, 889 F. Supp.2d 1129, 1146 (E.D. Wis. 2012). *See also Herrera v. Astrue*, No. CV-10-362, 2012 WL 1840128, at *4 n.1 (E.D. Wash. May 21, 2012) ("[A] GAF score can fluctuate depending on the current circumstances."). The ALJ herself noted that Plaintiff's GAF improved from 25 to 40 while he was hospitalized at Linden Oaks in 2010. (R. 24). Before she could rely on inconsistencies between Dr. Chappell and other medical sources, the ALJ was required to account for the fact that all the GAF scores she cited conflicted with one another as well as with Dr. Chappell.

Second, the ALJ did not account for what the May 2010 questionnaire actually asked Dr. Chappell to evaluate. The questionnaire did not inquire into Mazzuca's overall GAF level, but only his "current" GAF score and his "highest GAF past year." (R. 383).

14

This language leaves open the possibility that lower scores could exist at other times without conflicting with Dr. Chappell's report in May 2010.

Even if a valid inconsistency existed, moreover, the ALJ failed to provide any justification for rejecting Dr. Chappell's report out of hand. Dr. Chappell was a treating medical source. Social Security Ruling 96-2p instructs ALJs that inconsistencies may be grounds for giving less than controlling weight to treating source opinions. However, this does not necessarily mean that an ALJ can simply reject an expert report in the way the ALJ did in this case:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p. *See also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.").

The ALJ did not specifically discuss any of the factors referenced in SSR 96-2p or the regulations. There is no indication, for example, that she considered the fact that Dr. Chappell treated Mazzuca far longer than any other medical expert did. The ALJ also misstated the nature of Plaintiff's relationship with Dr. Chappell. The decision claims that Plaintiff only consulted his psychiatrist for medication management. (R. 24). However, Dr.

Chappell's notes repeatedly state that she saw Mazzuca for both psychotherapy and medication. (R. 285 - 300). The Court recognizes that an ALJ is not always required to discuss each of the criteria stated in 20 C.F.R. § 404.1527. However, it is difficult in this case to understand how the ALJ was able to set aside the deference that is always owed to a treating source opinion without addressing at least some of those factors.

Finally, the Commissioner claims that the ALJ did not err because she could infer from a score of 60 that Mazzuca was not disabled and because the RFC includes limitations that account for Dr. Chappell's assessment. The first of these claims is misplaced because the ALJ did not make a disability finding based on Dr. Chappell's score of 60. The ALJ noted that 60 "indicates moderate symptoms or a moderate impairment in social . . . functioning." (R. 28). The Commissioner overlooks that Dr. Chappell agreed with this assessment in full when she stated that Mazzuca had a "moderate" limitation in that functional area. (R. 385). The Commissioner fails to explain how the ALJ could have rejected Dr. Chappell's evaluation when the ALJ agreed with the psychiatrist's own evaluation of Plaintiff's social functioning. As for the RFC, the ALJ could not have reasonably considered Dr. Chappell's report by including significant limitations in Mazzuca's ability to work. An ALJ cannot logically reject a treating physician's report and then rely on it to support the RFC findings.

The ALJ's failure to note the regulatory criteria, combined with the stated reasons for her finding, means that substantial evidence does not support her rejection of Dr. Chappell's report. Plaintiff's motion is granted on this issue.

**B.     Remand is Necessary at Step 3**

The ALJ found at Step 3 that Mazzuca's impairments did not meet Listing 12.04

(affective disorders), Listing 12.09 (substance addiction disorders), "or any of the other listed impairments" found in Appendix 1 of the regulations. (R. 21). The Listings set out the criteria for physical and mental impairments related to various body systems. A claimant who demonstrates that he meets a Listing is presumed to be disabled. 20 C.F.R. § 404.1525(a). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). Mazzuca claims that the ALJ did not follow these guidelines in his analysis of Listing 12.04. Plaintiff also argues that remand is required because the ALJ should have considered whether his anxiety problems met Listing 12.06.

The Court agrees that the ALJ's discussion of Listing 12.04 is insufficient. Listing 12.04 contains three sets of criteria identified as Part A, Part B, and Part C. A claimant meets the Listing by showing either that he (1) satisfies both Part A and Part B, or (2) meets Part C alone.[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. A claimant satisfies Part C when he shows, in relevant part, that he has experienced "repeated episodes of decompensation, each of extended duration." *Id.* at § 12.04(C). The regulations define "repeated episodes" as three events within a one-year period. *Id.* at § 12.00. The ALJ found that Mazzuca did not meet this requirement because he only underwent one or two

---

[3] Plaintiff argues at length that his episodes of decompensation meet Part B. Part B of Listing 12.04 requires a claimant to show two of the following: (1) marked limitations in activities of daily living, (2) marked limitations in social functioning, (3) marked limitations in concentration, or (4) repeated episodes of decompensation. The ALJ, Dr. Chappell, and Dr. Kravitz all agreed that Mazzuca did not experience the first three of these criteria. Plaintiff does not challenge these findings. Thus, he has failed to demonstrate an essential requirement for satisfying Part B.

periods of decompensation. (R. 22).

Several problems stem from this finding. An episode of decompensation involves "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning[.]" *Id*. The Seventh Circuit has noted that major changes in a claimant's life setting such as hospitalization would qualify as an episode, "but so would many other scenarios." *Larson*, 615 F.3d at 750. As the regulations state, episodes can also be inferred from major changes in a claimant's medications. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.

Plaintiff claims that three events in his treatment history meet these criteria: (1) treatment at Linden Oaks and Christ Hospital, (2) worsening symptoms during the week of April 26, 2010, and (3) deteriorations in March and April 2011. The Commissioner does not address whether these events constitute episodes of decompensation. Instead, the Commissioner claims that the ALJ discussed the three events in her decision and argues that this was sufficient as long as the Court can follow the basis of the ALJ's reasoning.

Unfortunately, that is the problem with the Step 3 finding. The ALJ did not state which part of Mazzuca's psychiatric history constituted the one or two episodes of decompensation that she believed existed. This includes his hospitalization at Linden Oaks, which almost certainly qualifies. The ALJ noted the hospitalization, but she did make any finding on whether it was an episode of decompensation. More problematically, the ALJ did not consider the other two episodes that Mazzuca relies on. Dr. Chappell's treatment notes around the end of April 2010 concern the first anniversary of the suicide of Mazzuca's sister, an event that the record shows was upsetting to claimant. (R. 436). The psychiatrist's entries state that Mazzuca believed his medication had stopped working,

18

and that he had feelings of suicide, panic, and other distress. (R. 432-36). The ALJ also failed to discuss Dr. Radzevicius' notes for March 2011 indicating that Mazzuca's condition had worsened and that he felt suicidal on occasions. (R. 830). As a result, Dr. Radzevicius increased Mazzuca's level of Zoloft. (R. 830).

In addition, the ALJ's failure to properly consider Dr. Chappell's report has important implications for the Listing issue. Dr. Chappell stated that Mazzuca experienced three episodes of decompensation in a twelve-month period. (R. 385). The ALJ might have accepted this conclusion had she properly applied the factors for weighing Dr. Chappell's opinion.[4] For these reasons, remand is necessary so that the ALJ can reconsider the record on Listing 12.04 and state her reasoning on the Part C issue with greater clarity. Plaintiff's motion is granted on the Listing 12.04 issue.

Mazzuca's argument on Listing 12.06 (anxiety) is less persuasive. Like Listing 12.04, Listing 12.06 also contains Part A, Part B, and Part C. A claimant satisfies this Listing by showing that he either meets (1) Part A and Part B, or (2) Part A and Part C. The Part B elements for Listing 12.06 are identical to those under Listing 12.04. Thus, Mazzuca has not shown that he could meet Part B for the reasons stated above. Part C requires a showing that anxiety results "in [a] complete inability to function independently outside the area of one's home." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C). The ALJ concluded that Mazzuca could, in fact, function in this manner. (R. 22). Plaintiff does

---

[4] The ALJ gave great weight to Dr. Kravitz's report, which assessed Mazzuca's episodes of decompensation as "moderate." (R. 839). The regulations require an ALJ to assess decompensation on a numerical scale of "one or two, three, [or] four or more." 20 C.F.R. § 404.1520a(c)(4). If the ALJ relies on Dr. Kravitz on remand, she should explain how "one or two" episodes are derived from his "moderate" finding.

not contest this finding.  As a result, he has not shown why the ALJ erred or why remand would be likely to result in a different conclusion.  The Commissioner's motion is granted on the Listing 12.06 issue.

### C.      Substantial Evidence Does Not Support the Credibility Assessment

Mazzuca next argues that the ALJ erred in finding that his statements concerning the limiting effects of his symptoms were not fully credible.  He also objects to the assessment of his wife's testimony.

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work.  SSR 96-7p.  The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.  Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

### 1.      Mazzuca's Credibility

The ALJ found that Mazzuca's testimony was entitled to some credence, although she gave no indication of what parts she accepted or rejected.  (R. 27).  In support, the ALJ

accounted for a number of the factors outlined in the regulations and SSR 96-7p. She stated that Mazzuca had been able to participate in regular AA meetings and at least some social activities that were inconsistent with a claim of total disability. The ALJ cited a number of medical records as counter-evidence to Mazzuca's subjective claims. These included Dr. Kravtiz's report, which agreed with the ALJ's ultimate disability finding. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (discussing such medical evidence as support for a credibility determination). She also took careful note of Mazzuca's medication history and the psychotherapy he received to treat his mental impairment.

These grounds provide some basis for the ALJ's credibility assessment. But the ALJ could not assess Plaintiff's credibility on these grounds alone without first applying the correct standards to Plaintiff's treating physician. Dr. Chappell provided the strongest support for Mazzuca's statements on the limitations he experiences from depression and bipolar disorder. The psychiatrist stated that even on 70 mg. of Prozac, Mazzuca experienced decreased energy, persistent anxiety, and three episodes of decompensation a year, each lasting at least two weeks. (R. 384-85). The last finding supports Mazzuca's claim that he experiences down cycles that prevent him from working on a regular and sustained basis.

The ALJ's consideration of the medical record is also undermined by other reasons that raise serious concerns. Some are not reversible in themselves. She claimed, for instance, that Mazzuca was less credible because a SSA field officer noted that he was cooperative, clean, and showed no signs of any limitations. (R. 23, 205). This was not a ground on which to discredit Mazzuca. Having a psychiatric disorder does not preclude a person from being clean and cooperative. Indeed, Dr. Chappell noted that Mazzuca was

"cooperative" and showed an "appropriate" appearance, even though he had recently experienced a panic attack and felt suicidal. (R. 441). Dr. Kravitz echoed this in his report. (R. 843). As for limitations, Dr. Kravitz assessed numerous limitations that contradict the field employee's conclusion about Mazzuca.

The Court has greater concerns over the fact that the ALJ found Mazzuca to be less credible because he could not explain what "prompted the changes" in his mental condition after the alleged onset date of July 2008. (R. 26). A claimant is not required to explain the origin of his disorder. That is especially true of mental impairments, which by definition affect a person's mind and, potentially, the ability to have the kind of insight the ALJ sought. The ALJ should have been aware that both the regulations and SSR 96-7p governing credibility assessments speak only of a claimant's "symptoms." They do not authorize an ALJ to discount a claimant's credibility because he cannot explain why those symptoms began. *See* 20 C.F.R. § 404.1529(c)(4); SSR 96-7p. Equally important, the ALJ never asked Mazzuca to describe either the changes he experienced around his onset date or their cause. She only asked "What happened? What changed" in the context of Mazzuca's description of difficulties in getting out of bed in "2008, 2009, [and] 2010." (R. 53).

The ALJ laid great stress on her belief that Mazzuca's condition had improved after he stopped drinking in January 2007, and that this improvement continued through his onset date. *See* Record at 26 ("The medical evidence demonstrated improvement in his condition after sobriety as indicated above."). Her discussion is far from clear, but the ALJ appears to have thought that Mazzuca's statements could be discounted because no significant deterioration in his mental condition took place around the onset date of July

2008. However, the ALJ did not account for the records that are relevant to that timeframe. In June 2008, Mazzuca refused to go to work, felt anxious, and engaged in thinking that required Dr. Chappell to stress the distinction between "reality vs. fantasy." (R. 294). The psychiatrist's August 2008 note states that Mazzuca had abruptly quit his job, and the remaining notes for 2008 all indicate continuing anxiety. (R. 287-94). The ALJ was obligated to account for this part of the record suggesting that Mazzuca experienced something other than mere improvement.

The ALJ's credibility decision also relied heavily on Mazzuca's ability to work prior to January 2007, even though he was being treated for psychiatric problems at that time. The ALJ believed that if Plaintiff could work then, the fact that he still had the same mental impairments did not limit his present work capacity in the manner that Mazzuca claimed. This finding overlooks that Mazzuca's mental impairment was not necessarily the same during his disability period as it had been earlier. The diagnosis of bipolar disorder is not shown in the record for 2007. If the ALJ intended to rely on Mazzuca's earlier ability to work, she was obligated to take more careful note of the possible effects this post-2007 diagnosis might have on that ability.

The ALJ did notice certain functional deteriorations Mazzuca had experienced since his onset date, particularly his 2010 hospitalization. She found these to be of little concern, however, because they could all be attributed to Mazzuca's failure to take his medication on a regular basis. The ALJ stated, for example, that Mazzuca "went for treatment for years without any inpatient treatment or emergency room visits until his non-compliant behavior ensued." (R. 26). She did not draw out her conclusion in much detail, but the inference is clear: Mazzuca could work before January 2007, so he could also work during his

claimed disability period if he were only compliant with his medication.

The Court has grave concerns over the reasoning involved in this analysis.  It is undisputed that Mazzuca was not always consistent about taking his medication.  However, the ALJ's reasoning overlooks the possibility that his non-compliance was a *symptom* of his mental disorder, not a sign that Plaintiff was less credible because he was capable of managing his medication regimen.   The Seventh Circuit and other courts have repeatedly stressed that "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006).  *See also Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2006) (stating that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently"); *White v. Comm. of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."); *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009).  Mazzuca may or may not have been able to take his medications in the regular manner the ALJ believed would allow him to work.  The problem is that ALJ did not inquire into the matter and did not construct a logical bridge from the record to her conclusion on this crucial issue.

The Court's concern is heightened by the ALJ's scant attention to the link between Mazzuca's anxieties and his ability to work.  The ALJ noted in passing that Mazzuca quit his job as a medical technician and that he had applied to Menard's "without success."  (R. 23).  This fails to explain that the application was unsuccessful because Mazzuca walked out when he thought people were looking at him "funny."   The limiting effect of Plaintiff's symptoms is suggested throughout the record.  The ALJ failed to note, for example, that

24

Mazzuca was terminated from his last job in January 2007, even though he was taking Effexor at that time. (R. 56, 298). Mazzuca himself stated that his productivity at work had gone to "zero" before he was fired. The ALJ could not associate Mazzuca's past ability to hold a job with his present capacity to work without accounting for this event. Plaintiff also described what he termed "bizarre" thoughts that he had while working, such as the belief that his participation in financial planning was responsible for the election of George W. Bush.[5] (R. 56). While taking medication, Mazzuca also left an interview because the people around him were not wearing gloves. The ALJ was required to account for these facts before drawing links between Mazzuca's credibility, his ability to work, and his medication compliance.

She was also obligated to consider the fact that, even when on medication, Mazzuca's symptoms fluctuated from time to time. Social Security Ruling 96-7p instructs an ALJ to consider the frequency of a claimant's symptoms when assessing his credibility. The periodic nature of his symptoms was an important part of Mazucca's testimony. (R. 55). The ALJ gave no consideration to this point, noting only that he showed "improvement" after January 2007. The record – including the conflicting GAF scores discussed earlier – plainly shows fluctuations in Mazzuca's functioning after he became sober in January 2007. Such changes are not surprising for a person diagnosed with a mental impairment, particularly bipolar disorder. The Seventh Circuit has explained on many occasions that "a person who suffers from a mental illness will have better days and worse days[.]" *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). *See also Larson*, 615

___

[5] Mazzuca stated at the hearing that he continued to believe that was the case and that he might be targeted by the government. (R. 55-56).

F.3d at 751; *Phillips v. Astrue*, 413 Fed.Appx. 878, 886 (7th Cir. 2010) ("Many mental illness are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms.").

The ALJ appears to have set aside these changes in Plaintiff's functioning by ascribing his down cycles to non-compliance with his medication regimen. For the reasons discussed above, however, the ALJ could not discount the periodic nature of Mazzuca's symptoms merely by referring to his medication. The fact remains that Mazzuca was *not* fully compliant, and that reality had to be more fully explored before the ALJ could discount his credibility concerning the periodic nature of his distress.

Certainly, the record did not obligate the ALJ to give credence to everything Mazzuca stated. An ALJ is always entitled to discount a claimant's credibility when the proper grounds for doing so exist. *See Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). In this case, the ALJ failed to consider portions of the record that were favorable to claimant and did not draw a logical bridge between the record and her credibility finding. For these reasons, Plaintiff's motion is granted on the ALJ's assessment of his credibility.

### 2. Mrs. Mazzuca's Credibility

Plaintiff also claims that the ALJ improperly assessed the testimony his wife gave at the hearing by giving it "little weight." (R. 27). An ALJ considers testimony of non-medical witnesses either by weighing it or by assessing its credibility. *See* SSR 06-3p; SSR 96-7p. In either case, the ALJ should consider the nature and extent of the witness's relationship with the claimant, the consistency with other evidence, and other factors that tend to support or refute the witness's statements. SSR 06-3p.

The ALJ's brief consideration of Ms. Mazzuca's testimony is troubling in this case. The ALJ complained that no independent evidence verified the wife's testimony concerning Plaintiff's activities of daily living. Without further explanation, however, it is not clear what evidence would corroborate the day-to-day activities a claimant undertakes in the privacy of his own home. The ALJ also relied on the fact that Mrs. Mazzuca did not personally witness all of Plaintiff's ongoing activities. That is undisputed, as Mrs. Mazzuca testified that she works all day. However, SSR 06-3p requires an ALJ to account for "the nature and extent of the relationship" between the claimant and a non-medical source like Mrs. Mazzuca. Mr. and Mrs. Mazzuca had been married for nineteen years at the time of the hearing. (R. 18). The ALJ was required to explain why such a long and intimate relationship did not support Mrs. Mazzuca's statements about what she observed.

In addition, both husband and wife gave strikingly similar testimony. Despite this, the ALJ gave Ms. Mazzuca "little weight," even though she found that Plaintiff's testimony was partially credible. The ALJ should explain more fully why such similar testimony should have been assessed differently. As other errors already require remand, the ALJ should restate more fully her reasons for giving little weight to Plaintiff's wife. Plaintiff's motion is granted on this point.

## IV. <u>Conclusion</u>

For the reasons stated above, Plaintiff's and the Commissioner's motions for summary judgment are granted in part and denied in part. This case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. It is so ordered.

**ENTERED:**

_Daniel G. Martin_
_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: April 2, 2013